**MING SHI XUE, Petitioner,**

v.

**BOARD OF IMMIGRATION APPEALS, U.S. Department of Justice, Respondents.**

**Docket No. 04–0374 AG.**

United States Court of Appeals, Second Circuit.

Argued: Sept. 26, 2005.

Decided: Feb. 21, 2006.

Henry Zhang, Zhang & Associates P.C., New York, NY, for Petitioner.

Neeli Ben–David, Assistant United States Attorney, for David E. Nahmias, United States Attorney for the District of Georgia, Atlanta, GA, for Respondents.

Before: CALABRESI, KATZMANN, and B.D. PARKER, Circuit Judges.

CALABRESI, Circuit Judge.

Asylum petitions of aliens seeking refuge from alleged persecution are among the hardest cases faced by our courts. They are not games. And, despite their volume, these suits are not to be disposed of improvidently, or without the care and judicial attention—by immigration judges, in the first instance, and by federal judges, on appeal—to which all litigants are entitled.[1] We should not forget, after all, what

---

1. *See Zhen Li Iao v. Gonzales,* 400 F.3d 530, 535 (7th Cir.2005) ("The cases that we see are not a random sample of all asylum cases, and the problems that the cases raise may not be representative. Even if they are representative, given caseload pressures and, what is the other side of that coin, resource constraints, it is possible that nothing better can realistically be expected than what we are seeing in this and like cases. But we are not authorized to affirm unreasoned decisions even when we understand why they are unreasoned."); *Guchshenkov v. Ashcroft,* 366 F.3d 554, 560 (7th Cir.2004) ("We are mindful that immigration judges, and the members of the Board of Immigration Appeals, have heavy caseloads. The same is true, however, of federal district judges, and we have never heard it argued that busy judges should be excused from hav-

is at stake. For each time we wrongly deny a meritorious asylum application, concluding that an immigrant's story is fabricated when, in fact, it is real, we risk condemning an individual to persecution. Whether the danger is of religious discrimination, extrajudicial punishment, forced abortion or involuntary sterilization, physical torture or banishment, we must always remember the toll that is paid if and when we err.[2]

Yet, at the same time, the nature of asylum makes it possible (and in some contexts, rather easy) for applicants to submit false or exaggerated claims. And there is no simple way to sift through and separate dishonest asylum petitions from *bona fide* ones. Under the circumstances, it is not surprising that the position of overburdened immigration judges and overworked courts has become a matter of wide concern.[3] It is bound to be such when trivial mistakes can unwittingly lead

to flawed decisions with grave consequences.

■ It is with firm recognition of these realities that our court decided in *Majidi v. Gonzales*, 430 F.3d 77 (2d Cir.2005), that, where an asylum seeker has given "dramatically different" accounts of his alleged persecution, an immigration judge ("IJ") may properly find him incredible "without soliciting from the applicant an explanation for the inconsistency." *Majidi*, 430 F.3d at 81. To hold, as we did in *Majidi*, that inconsistencies that are "dramatic"—that is, sufficiently conspicuous and central to the applicant's claim as to be self-evident—need not be affirmatively announced is, we reaffirm, both right and wise. It is equally true, however, that when an inconsistency is not self-evident, an IJ may not rely on it to support a credibility determination without first bringing the perceived discrepancy to the alien's attention, thereby giving the alien an opportunity to address and perhaps

ing to deliver reasoned judgments because they are too busy to think.'").

**2.** *See Lanza v. Ashcroft,* 389 F.3d 917, 927–28 (9th Cir.2004) ("The liberty interests involved in removal proceedings are of the highest order. Removal 'visits a great hardship on the individual and deprives him [or her] of the right to stay and live and work in this land of freedom.' It is 'a drastic measure' and for some 'the equivalent of banishment or exile.'" (quoting *Bridges v. Wixon,* 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945); *Jordan v. De George,* 341 U.S. 223, 231, 71 S.Ct. 703, 95 L.Ed. 886 (1951))).

**3.** *See* Memorandum from The Attorney General to Members of the Board of Immigration Appeals (Jan. 9, 2006) ("I have watched with concern the reports of immigration judges who fail to treat aliens appearing before them with appropriate respect and consideration and who fail to produce the quality of work that I expect from employees of the Department of Justice. While I remain convinced that most immigration judges ably and professionally discharge their difficult duties, I believe there are some whose conduct can aptly

be described as intemperate or even abusive and whose work must improve.... For the aliens who appear before them, our immigration judges are the face of American justice.... Not all aliens will be entitled to the relief they seek. But I insist that each case be reviewed proficiently and that each alien be treated with courtesy and respect."); *Benslimane v. Gonzales,* 430 F.3d 828, 830 (7th Cir.2005) ("[T]he adjudication of these cases at the administrative level has fallen below the minimum standards of legal justice. Whether this is due to resource constraints or to other circumstances beyond the Board's and the Immigration Court's control, we do not know .... All that is clear is that it cannot be in the interest of the immigration authorities, the taxpayer, the federal judiciary, or citizens concerned with the effective enforcement of the nation's immigration laws for removal orders to be routinely nullified by the courts ...." (internal citations omitted)); *see also* Adam Liptak, *Courts Criticize Judges' Handling of Asylum Cases,* N.Y. Times, Dec. 26, 2005, at A1.

reconcile the seeming inconsistency, to the IJ's satisfaction, at the least.[4]

Because, in the case before us, the IJ's credibility ruling depended on putative discrepancies that were not obvious and were not discussed at any point during the hearing, we grant the petition for review, and we vacate and remand the case for further proceedings consistent with this decision.

## BACKGROUND

A native of the Fujian province of China, petitioner Ming Shi Xue (hereinafter "petitioner" or "Xue") left his homeland in June 2000 and entered the United States in May 2001.[5] Within a year of his arrival in America, petitioner filed for asylum on the basis of the coercive family planning policies to which, principally, his wife had been subjected while Xue was still in China.

### I. Xue's Asylum Application

In April 2002, petitioner submitted an I–589 application, which, along with routine background and biographical information, included a page-long addendum that described the nature of Xue's asylum claim. In the addendum, petitioner stated that he married his wife, Yu Lan Chen ("Chen"), in a traditional ceremony in January 1983. Nearly a year later, they registered their marriage formally, just in time for the birth of their first child (a boy) in late January 1984. Xue's statement suggested that news of their first son prompted family planning officials from his village to force his wife both to wear an intrauterine device ("IUD") and to attend IUD checkups regularly.

Petitioner and his wife were apparently undeterred by these restrictions. They wanted additional children, ostensibly because, as Xue's I–589 application indicated, their family was involved in farming, and they needed "labor force to do the farming work." As a result, they obtained the assistance of a doctor who secretly removed Chen's IUD. After the procedure, Xue's wife became pregnant and went into hiding at her mother's home. During that time, she gave birth to a second son. But, according to petitioner's statement, since they were not permitted to register the child, the couple gave the child away to a fellow villager.

Petitioner's application also explained that Xue and his wife then "wanted very much to have a girl" because their first two children had been boys. Chen became pregnant for a third time in June 1986. To avoid discovery, Chen told the school authority (for whom she worked as a teacher) that she required time off to tend to her health. Again, she went into hiding and had her third child—this time, a daughter—in March 1987. Xue's statement asserted that his wife returned home one month after the birth of their third child, and resumed work after obtaining a babysitter to care for their daughter.

In his I–589 statement, petitioner claimed that one month after his wife's return, someone relayed to government officials the fact that he and his wife had three children. As a result, four local officials forced Xue's wife to go to Longtian Township Hospital where she was reportedly sterilized. The application contended that Chen was also fired from her position as a teacher for violating the coun-

---

4. We will discuss, *infra*, why we believe this ruling is fully consistent with the holding of *Majidi*, which, on its facts, pertained only to dramatic or self-evident inconsistencies at the heart of an applicant's asylum petition.

5. Petitioner spent six months in Peru, four months in Brazil, and one month in an "unknown place" before arriving in Miami on May 13, 2001.

try's family planning policies. In addition, petitioner was required to pay an enrollment fee to allow their daughter to attend school because she qualified as an unauthorized "extra birth." The closing paragraph of the addendum posited that Xue feared imprisonment and fines in China for his family's violation of the country's population control policies.

## II. Xue's Asylum Hearing

In due course, petitioner was placed in removal proceedings and given an asylum hearing. On September 3, 2002, petitioner testified before immigration judge Joseph A. Russelburg ("IJ"). At the outset, Xue confirmed that he had prepared his I–589 application with the aid of counsel, and that he understood and stood by its contents. During direct examination, petitioner essentially repeated the narrative he had told in his asylum application.[6] Xue explained that his wife had been forced to have an IUD insertion after the birth of their first child. They had paid a private doctor to remove the IUD, however, and, shortly thereafter, Chen became pregnant for a second time. She obtained a leave of absence from the school at which she taught, and went into hiding at her mother's home. According to petitioner, Chen reemerged from hiding only after their second child was born. Although she subsequently returned to her job, Xue stated that, in order for his wife to retain her employment, they could not officially register their second child. As a result, that son was left to someone else's care. Petitioner also reminded the court that he and his wife had their third child in March 1987, using the same approach they had taken to obscure the birth of their second

child (private removal of the IUD, a leave of absence from Chen's employer, hiding at her mother's home until the child's birth, and afterwards, a return to her teaching post). Xue reaffirmed that his wife had been forcibly sterilized and fired from her job once family planning officials learned of their three children. Finally, petitioner again claimed that they had been compelled to pay a fee each semester so that their daughter could attend school.

During cross-examination, the lawyer for the Immigration and Naturalization Service ("INS") notably failed to raise any concerns that ultimately figured in the IJ's decision denying Xue's claim. Twice, in fact, the IJ intervened to chide the government for lines of questioning that apparently were not "useful to the Court." On one of these occasions, the government's lawyer had begun to quiz petitioner about certain documents, seemingly testing whether Xue could recall their contents from memory. The IJ disapproved: "Counsel, I think you're wasting my time and wasting everybody else's time. Why don't you move on to something a little bit more relevant and fertile..." In response, the lawyer indicated that he had no other questions and promptly ended his otherwise uneventful examination.

## III. The Immigration Judge's Decision

At the end of the hearing, the IJ issued an oral opinion denying asylum, withholding of deportation, and relief under the Convention Against Torture. The IJ's decision rested on an adverse credibility finding which, in turn, was based on three putative inconsistencies. First, the IJ said that petitioner's claim that he and his wife

---

**6.** The IJ's adverse credibility ruling in this case did not suggest that there were discrepancies between petitioner's written statement and his hearing testimony. Nevertheless, because the content of what was discussed dur-

ing the hearing—and what was not—is significant in this case, we provide a basic overview of petitioner's testimony, even though much of it overlaps with Xue's I–589 application.

had wanted a second child because they needed help with their farming work—an assertion corroborated by a statement submitted by Xue's wife—was belied by the couple's decision to give the child to another family.[7] Second, the IJ did not find credible Xue's testimony that his wife was able to hide her pregnancies either from the government—given petitioner's testimony that his wife was subjected to regular checkups—or from her employer from whom she supposedly obtained two leaves of absence: "[I]t appears to the Court that [the] claim that [petitioner's wife] secretly had the IUD removed, was able to remain in hiding through the entire term of her pregnancy and delivery, and returned to her job with no apparent consequences and apparently no one in the government being aware that she was either pregnant or had delivered a child, seems to be implausible and improbable given the fact that she was required to undergo periodic checkups." Finally, the IJ suggested that petitioner's claim that his wife was forcibly sterilized, even though the government presumably would have known only about two of her three children, clashed with the country profile's account of China's enforcement techniques.[8]

Principally on the basis of these inconsistencies, the IJ rejected Xue's application for asylum. On December 30, 2003, with one qualification,[9] the Board of Immigration Appeals ("BIA") summarily affirmed the IJ's decision. Petitioner subsequently filed this timely appeal.

7. The IJ explained: "Both [petitioner's] application statement and the statement that his wife provided in support of his application indicate that the reason that [petitioner] and his wife wanted more than one child after their first son was born is that they had a need for labor force to do the farming work.... The problem with that premise is that it is contrary to what [petitioner] says happened with respect to that second child. According to [petitioner], after the child was born, the child was placed in another home and was not even raised in [petitioner] and his wife's family, and presumably was therefore not available to provide the labor force necessary to do the farming work, which was the motivating factor for having the child in the first place, according to [petitioner] and his wife."

8. With respect to this point, the IJ reasoned: "The information available concerning the enforcement of the family planning policy in China is that most of the policies are enforced by means of persuasion, education, economic incentives, economic sanctions, and peer pressure to get individuals to comply with the population control policies. Although there may be instances where overzealous officials take the enforcement beyond those standard practices, there is nothing in this case that indicates that anyone approached the respondent and his wife and attempted to educate them prior to the sterilization procedure. And according to the testimony of the [petitioner], the family planning officials would not have known that the [petitioner] had three children. They would have, at best, thought that he had just had a second child approximately three years, a little bit over three years, after the birth of his first child. While that may have been technically a violation of the family planning policy in China, it's not likely that the immediate mechanism to enforce the policy, or to sanction the respondent for failing to comply with the policy, would have been a forced sterilization procedure. More likely, it would have involved education or some sort of economic sanction."

9. In addition to the three inconsistencies supporting the adverse credibility finding, the IJ also intimated that Xue's asylum claim was undermined by the fact that he did not leave China until thirteen years after his wife was allegedly sterilized. On appeal, the BIA explicitly disavowed this rationale: "The Immigration Judge's decision is affirmed and adopted for the reasons stated therein, except to the extent page 13 of such decision may be read to·suggest that the [petitioner], if credible, would not have a well-founded fear of persecution in China because of the passage of time from when his spouse was allegedly forcibly sterilized and when he departed China."

## DISCUSSION

■ In circumstances, such as those before us, "[w]hen the BIA affirms the IJ's decision in all respects but one, we review the IJ's decision as modified by the BIA decision." *Ming Xia Chen v. BIA*, 435 F.3d 141, 144 (2d Cir.2006). And where an asylum seeker has challenged an adverse credibility decision, we typically afford "particular deference" to the IJ's conclusions. *See Montero v. INS*, 124 F.3d 381, 386 (2d Cir.1997). Accordingly, our review of an IJ's credibility assessment is an "exceedingly narrow inquiry to ensure that the IJ's conclusions were not reached arbitrarily or capriciously ... [and] that credibility findings are based upon neither a misstatement of the facts in the record nor bald speculation or caprice." *Zhou Yun Zhang v. INS*, 386 F.3d 66, 74 (2d Cir. 2004) (internal citations and quotation marks omitted).

■ Petitioner does not dispute the "highly deferential" standard of review generally applicable to appeals that call into question an IJ's credibility determination. *See Majidi*, 430 F.3d at 79. Rather, petitioner contends, *inter alia*, that the IJ should not have based his credibility ruling on alleged discrepancies that were not previously raised. Under the circumstances, we agree. Because the asserted inconsistencies were not so dramatic as to be self-evident, *cf. Majidi*, 430 F.3d at 79, and because neither the IJ nor the government identified the concerns undergirding the IJ's credibility finding before the IJ announced them in his ruling, petitioner was deprived of an opportunity to address and explain the supposed discrepancies. The failure to provide such an opportunity contravenes basic principles of asylum law established by our prior holdings, and requires us to vacate the adverse credibility determination and remand the case for reconsideration.

\* \* \* \* \* \*

■ Both the BIA and our circuit have indicated that, under the Immigration and Naturalization Act ("INA"), it is appropriate for immigration judges to play an affirmative role in developing, along with the parties, a complete and accurate record on which to decide an applicant's asylum claims. Section 239 of the INA states that an IJ "shall administer oaths, receive evidence, *interrogate, examine, and cross-examine* the alien and any witnesses." 8 U.S.C. § 1229a(b)(1) (emphasis added). Citing the precursor to this statutory provision, the BIA declared in *In re S–M–J*, 21 I. & N. Dec. 722 (BIA 1997), that "the [Immigration and Naturalization] Service and the Immigration Judge both have a role in introducing evidence into the record." *In re S–M–J*, 21 I. & N. Dec. at 726. The BIA also explained that "in light of the bifurcated process experienced by many asylum applicants, whereby applicants begin with a nonadversarial approach at a Service Asylum Office and move to a more 'adversarial' proceeding before an Immigration Judge, a cooperative approach in Immigration Court is particularly appropriate." *Id.* at 723–24.[10] *See also Giday v. Gonzales*, 434 F.3d 543, 549–50 (7th Cir.2006) ("An immigration

---

**10.** The BIA's holding in *In re S–M–J* pertained specifically to "the need for the parties to introduce supporting documents into the record," but its rationale swept more broadly, and underscored the ultimate function and objective of asylum proceedings: "[T]he [INS] has an obligation to uphold international refugee law, including the United States' obligation to extend refuge where such refuge is warranted. That is, immigration enforcement obligations do not consist only of initiating and conducting prompt proceedings that lead to removals at any cost. Rather, as has been said, the government wins when justice is done." *In re S–M–J*, 21 I. & N. Dec. at 727.

judge, unlike an Article III judge, is not merely the fact-finder and adjudicator but also has an obligation to establish the record."); Deborah E. Anker, *Law of Asylum in the United States* 167 (3d ed. 1999) ("The adjudicator, whether the Asylum Officer or the Immigration Judge, is not the applicant's adversary, and a 'cooperative approach' is appropriate in both settings." (citing *In re S–M–J*, 21 I. & N. Dec. 722)).

Like the BIA, we have also endorsed and encouraged an active role by immigration judges in presenting and clarifying an asylum applicant's case. In *Guan Shan Liao v. United States*, 293 F.3d 61 (2d Cir.2002), for instance, although we did not detail an IJ's precise duties in this context (because the issue had not been argued), we found it "unfortunate that ... basic and relevant testimony ... was not elicited from petitioner." *Guan Shan Liao*, 293 F.3d at 70. Moreover, with regard to untraversed credibility determinations, we observed in *Jin Shui Qiu v. Ashcroft*, 329 F.3d 140 (2d Cir.2003), that we had previously "prodded immigration tribunals to give petitioners a chance to respond to the adjudicator's concerns about missing or inconsistent evidence or testimony." *Jin Shui Qiu*, 329 F.3d at 156 n. 17 (internal quotation marks omitted). As an example of this, we referred to our decision in *Alvarado–Carillo v. INS*, 251 F.3d 44 (2d Cir.2001), in which our remand instructions expressly noted the value and desirability of preserving an opportunity for an alien to address what an IJ seemingly views as inconsistent testimony:

> To the extent that the BIA determines on remand to accord significance to any inconsistencies, we encourage the BIA to consider providing some means for petitioner to offer an explanation for them. We note that, on appeal to the BIA, petitioner was able to explain to the BIA's satisfaction the inconsistencies relied upon by the IJ, but was not pro-

vided the same opportunity to address the items raised *sua sponte* in the BIA Opinion.

*Alvarado–Carillo*, 251 F.3d at 56 (internal citation omitted).

In *Jin Shui Qiu*, we took note of all of this—the language of the INA, the position of the BIA articulated in *In re S–M–J*, and our circuit's intimations in *Guan Shan Liao* and *Alvarado–Carillo*. But, because it was unnecessary to our decision, we expressly did not reach the issue of "whether the IJ has a duty to assist ... the counseled petitioner in developing his case," *Jin Shui Qiu*, 329 F.3d at 156. As a result, though we characterized these issues as "nontrivial," we did not decide "whether the IJ has any duties in these respects and, if so, what is the proper remedy for breach." *Id.* at 156 n. 17. Instead, we left the specification of these duties, assuming they existed, to future circumstances where answering these unsettled questions was needed for the disposition of a case. *See Jin Shui Qiu*, 329 F.3d at 156 ("We think it prudent not to reach this open question of law, which is not necessary to our decision....").

With respect to an IJ's responsibilities relating to purportedly inconsistent testimony, the first such occasion arose in *Majidi*. In that case, an IJ had delivered an adverse credibility ruling on the ground that the asylum applicant, Sk Shahriair Majidi, had supplied "dramatically different" accounts of the persecution he allegedly suffered in Bangladesh. *See Majidi*, 430 F.3d at 81. Assuming that the parties were familiar with "the facts, the procedural history, and the scope of issues presented on appeal," *id.* at 79, we did not recite the full history or circumstances of the case. Throughout the opinion, however, we emphasized the strikingly different

versions of the alleged persecution stories provided by the petitioner in *Majidi*.[11]

In a written statement, Majidi claimed that, during a 1993 incident, members of the Bangladesh Nationalist Party ("BNP") ransacked his home while he was away, threatened his family, and demanded to know his whereabouts. *See id.* at 80. In contrast, at his asylum hearing, Majidi testified that, in 1993, BNP members had come to his home while he was present, had "abused" and "threatened" him personally, and forbade him from conducting political meetings in the future. *See id.* On appeal, Majidi maintained that there was an explanation for the discrepancy (*i.e.*, that he had been referring to two different incidents), and that the IJ should have asked for clarification before depending on the seemingly incompatible testimony to find Majidi incredible. *See id.* We rejected these contentions, concluding instead that "the IJ's failure to inquire how petitioner could reconcile his 'dramatically different' accounts of the same 1993 event does not render insubstantial the evidence supporting the IJ's adverse credibility finding." *Id.* at 81.

Where, as in *Majidi*, the contradiction is obvious and substantial—*i.e.*, where the relevant inconsistency is sufficiently conspicuous as to be evident, and where it is central enough to the applicant's claim that it could not have been reasonably overlooked by the parties or the IJ—this is clearly correct. In *Majidi*, the differences between the alien's written statement and his oral testimony were stark and unmistakable. *Cf. Yun–Zui Guan v. Gonzales*, 432 F.3d 391, 398 (2d Cir.2005) ("[W]here a petitioner provides two *entirely different* accounts of persecution ... [*i.e.*,] where ... a petitioner has provided two distinct, non-overlapping accounts of persecution, an IJ will be unable to point to any 'specific inconsistencies' between these accounts because the accounts are inconsistent *in toto*. In such circumstances, an IJ must instead rely on the commonsense observation that it is inconsistent for a petitioner to respond to the same question about the nature of his asylum claim with two entirely different responses." (emphasis in original)). In one version of his story, Majidi was not present when his persecutors entered his home, and his family members were the victims of the BNP's threats. In his second version, however, Majidi was home when the BNP persecutors arrived, and he was personally the target of their abuse. These inconsistencies, moreover, riddled the *core* of Majidi's allegations of persecution, and they were in no way incidental or peripheral to his narrative. *Cf. Ceballos–Castillo v. INS*, 904 F.2d 519, 520 (9th Cir.1990) (distinguishing between "incidental" discrepancies and those inconsistencies that relate to "the heart of the asylum claim").[12] In situations of this sort,

---

11. In fact, on three separate occasions, we adopted the IJ's characterization of Majidi's testimony as presenting "dramatically different" accounts of Majidi's alleged persecution. *See Majidi*, 430 F.3d at 79, 80, 81.

12. Our circuit has also observed that inconsistencies fall along a spectrum, with some being more serious and damaging than others. *See, e.g., Diallo v. INS*, 232 F.3d 279, 288 (2d Cir.2000); *Ramsameachire v. Ashcroft*, 357 F.3d 169, 180 (2d Cir.2004) ("[T]he weight accorded to any inconsistencies between the alien's interview statements and his or her subsequent assertions will depend on the nature of the variances.... [M]inor factual discrepancies ... may simply reflect the fact that the alien has had the chance to parse his or her experience more carefully or refresh his or her recollection after the initial interview. Immaterial inconsistencies need not be construed as an attempt to massage the alien's statements into a more viable claim. Where the alien's [earlier] statements and his or her later testimony present materially different accounts of his or her purported persecution, however, the inconsistencies may render the

we need not, and should not, saddle immigration tribunals with the task of announcing inconsistencies, for it can properly be assumed that the asylum applicant and his counsel are aware of them. In such cases (like *Majidi*), it must be the applicant's responsibility to proffer, with or without prompting, an explanation for what appears on its face to be a clear contradiction.

As noted, *Majidi* repeatedly emphasized the dramatic and material nature of the inconsistency before the panel. That characterization was consonant with the IJ's express findings that the asylum applicant in *Majidi* had presented "dramatically different" accounts of the event that constituted the alleged persecution. Those were the facts before the *Majidi* court. At one point in the opinion, however, the panel in *Majidi* did state: "We hold that an IJ may rely on an inconsistency in an asylum applicant's account to find that applicant not credible—provided the inconsistency affords 'substantial evidence' in support of the adverse credibility finding—without soliciting from the applicant an explanation for the inconsistency." *Majidi*, 430 F.3d at 81. This broad statement, if taken out of the context of the facts of *Majidi*, would bind us in the instant case—which arises from perceived inconsistencies that are not plainly obvious or dramatic. But, as our court recently noted in *Xiao Ji Chen v. Dep't of Justice*, 434 F.3d 144 (2d Cir. 2006), to the extent that the above cited statement in *Majidi* referred not just to circumstances similar to those presented by the facts before it, but also to "potential circumstances" that were not before it,

"the panel was of course offering dicta." *Xiao Ji Chen*, 434 F.3d at 161 (quoting *United States v. Garcia*, 413 F.3d 201, 232 n. 2 (2d Cir.2005) (Calabresi, *J.*, concurring) ("[Dicta] is not and cannot be binding. Holdings—what is necessary to a decision—are binding. Dicta—no matter how strong or how characterized—are not.")). An opinion simply cannot hold more than the facts before it. Accordingly, the statement cited above in *Majidi* must be taken as dicta—significant and worthy of respect—but expressly not binding.

\*     \*     \*     \*     \*     \*

What therefore remains undecided after *Majidi* is the quite different question presented by the instant case: whether an IJ may properly base an adverse credibility finding on perceived inconsistencies without first bringing them to the applicant's attention when the supposed discrepancies or contradictions in the testimony are *not* obvious—that is, where they are not premised on "dramatically different" accounts of the alleged persecution. Though this is a question of first impression in the federal courts, it is not a question as to which we are without guidance. On the contrary, the basic rationales underlying several of our circuit's bedrock holdings lead us to conclude that, where the perceived incongruities in an asylum applicant's testimony are not plainly obvious, an IJ cannot rely on them to support an adverse credibility ruling without first identifying the alleged inconsistencies for the applicant and giving the applicant an opportunity to address them.

alien's testimony incredible."). In *Ramsameachire*, however, the significance or "magnitude" of the inconsistency was thought to impact the extent to which an IJ could rely on it to find an alien incredible. In the present context, we hold that, how central the putative inconsistency is in the overall scheme of an applicant's claims also may bear on whether the inconsistency is sufficiently glaring so that the alien can be presumed to be constructively, if not actually, on notice of the alleged contradiction. As, on its facts, was the case in *Majidi*. .

■ Three lines of reasoning support our conclusion. First, in the parallel context of cases where an IJ finds that corroborative evidence is required to support the asylum petition, we demand that immigration judges give refugee seekers an opportunity to address and, where possible, rectify perceived deficiencies in their testimony. In *Jin Shui Qiu*, for instance, we stated that, "to turn down a refugee candidate for want of sufficient corroboration, the adjudicator must (a) identify the particular pieces of missing, relevant documentation, and (b) show that the documentation at issue was reasonably available to the petitioner." *Jin Shui Qiu*, 329 F.3d at 153. In that case, we further explained that "the IJ and BIA had *no leeway* to deny [petitioner's] application without *first* (a) pointing to specific pieces of missing, relevant documentation, and (b) showing that this documentation was reasonably available to [petitioner]." *Id.* (emphasis added). Moreover, in *Diallo v. INS*, 232 F.3d 279 (2d Cir.2000), we required that an adjudicator explicitly "assess [the applicant's] explanations for his failure to produce the requested corroborative evidence." *Diallo*, 232 F.3d at 289.

These directives ensured that, before denying an asylum petition because of insufficient corroboration, an IJ gave adequate and meaningful notice to the applicant of evidence that the IJ believed was significant and missing. This notice requirement, moreover, was designed not only to guard against arbitrary and excessive requests by an IJ, *see Jin Shui Qiu*, 329 F.3d at 153 ("Unless the BIA anchors its demands for corroboration to evidence which indicates what the petitioner can reasonably be expected to provide, there is a serious risk that unreasonable demands

will inadvertently be made."), but also, and equally importantly, to guarantee applicants an opportunity to remedy the supposed evidentiary gap, *see Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 394–95 ·(2d Cir.2005) ("[I]f [an IJ] intends to rely on the absence of certain corroborative evidence to hold that an applicant has not satisfied his burden of proof, [the IJ] must give the applicant an opportunity to explain its absence.").

For essentially these same reasons, just as it is improper for an IJ to deny asylum on insufficient corroboration grounds without first giving the applicant an opportunity to submit what may be readily available evidence, it is also error for an IJ to find an applicant's testimony inconsistent without first raising the putative discrepancies during asylum proceedings so that the petitioner has a chance to provide what may be satisfactory explanations for the supposed problem. Without this requirement, asylum applicants would frequently be denied the opportunity to clarify genuinely consistent testimony that the IJ has unwittingly misconstrued. And, conversely, immigration judges could prematurely decide that testimony is inconsistent when, in fact, the purported discrepancies readily admit of explanations which the IJ would find valid.[13]

■ Second, where a petitioner's testimony was seemingly too vague, we have asked immigration judges to request additional details before concluding that the narrative was not credible. Thus, in *Jin Shui Qiu*, we said: "Where an applicant gives very spare testimony ... the IJ or the INS may fairly wonder whether the testimony is fabricated." *Jin Shui Qiu*, 329 F.3d at 152. But instead of reflexively surrendering to "nagging doubts about an

---

**13.** Obviously, such a requirement is not needed when, as in *Majidi*, the inconsistency is "dramatic" or obvious on its face, for then the petitioner can be assumed to be aware—without being told—of the need to explain it.

applicant's credibility due to the spareness of her testimony," we encouraged the IJ (along with the INS) to "probe for incidental details, seeking to draw out inconsistencies that would support a finding of lack of credibility." *Id.* One reason for our recommendation had to do with our uncertainty about whether spare testimony could alone support a finding of credibility. *See id.* But we also underscored the dangers of allowing judges to dispose of potentially legitimate asylum claims for reasons that could be conjured up at will:

> [S]ince the list of circumstantial details can be expanded indefinitely, a legal standard that empowers an IJ or the BIA to rule against a petitioner who fails to anticipate the particular set of details that the fact-finder desires (*but does not request, through questions directed to the applicant*) is no standard at all. It would enable the administrative decisionmaker to reject whichever applicants that fact-finder happens to disfavor.

*Jin Shui Qiu,* 329 F.3d at 151–52 (emphasis added).

These concerns are equally valid in the context of immigration judges deciding that portions of an applicant's testimony are inconsistent or implausible when the asserted discrepancies are not self-evident. Like additional circumstantial details, which can almost endlessly be required, one portion of an alien's narrative can all too readily be juxtaposed with another part in such a way as to render the testimony curious in the eyes of a prematurely skeptical judge. Moreover, the possibility of such "inconsistencies" exists even when there are perfectly reasonable, but unsolicited, explanations for the supposed problem. Beneath most compilations of written and testimonial evidence, there lie many possible subterranean inconsistencies and implausibilities that *could* be unearthed and held against the petitioner. For them to surface for the first time in an IJ's final decision prevents the asylum seeker from explaining—perhaps to the IJ's satisfaction—why the perceived concerns are not, in fact, problematic. Under the circumstances, in order to limit the risk that an IJ could "reject whichever applicants that fact-finder happens to disfavor" on the basis of a "list of [perceived inconsistencies that] can be expanded indefinitely," *see id.,* we deem it appropriate to require administrative decisionmakers to afford applicants an opportunity to address such latent or otherwise not obvious or "dramatic" discrepancies before depending on them as a basis for a determination of no credibility.[14]

■ Finally, in *Cao He Lin,* we said that an IJ must actively appraise the explanations that an applicant, in order to rectify discrepancies in his testimony, gave. *See Cao He Lin,* 428 F.3d at 403 ("Although the IJ was not required to credit [petitioner's] explanations even if they appear plausible on a cold record ... [the IJ] was required to take those explanations into account.... Absent a reasoned evaluation of [petitioner's] explanations, the IJ's conclusion that his story is

---

**14.** Moreover, without notice, an applicant is left to guess whether testimony that could be construed as inconsistent will be thought to raise the sort of "minor and isolated" discrepancies that would not, in the ordinary course, justify an adverse credibility finding, or whether the non-obvious problems will be taken to be more serious and, as a result, used to find the alien incredible. And, of course, the alternative of volunteering explanations for every conceivable inconsistency does not work. For, as the Sicilian proverb (derived from a Roman law maxim) warns, *"Scusa non richiesta, accusa manifesta "*—An unsolicited excuse is a self-accusation, and hence evidence of guilt. Once again, these problems do not arise when, as in *Majidi,* the inconsistency is "dramatic."

implausible was based on flawed reasoning and, therefore, cannot constitute substantial evidence supporting [the IJ's] conclusion." (internal citations omitted)). But the rule applied in *Cao He Lin* makes sense only if decisionmakers are actually confronted with an alien's proffered explanation. *See also Kaur v. Ashcroft*, 379 F.3d 876, 887 (9th Cir.2004) ("An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency.").[15]

\*      \*      \*      \*      \*      \*

■ Quite apart from the above mentioned lines of cases that strongly support the requirement that an alien be given a meaningful opportunity to explain purportedly improbable or inconsistent testimony, the requirement that such an opportunity be given finds a logical basis in the particular relationship between decisions of the immigration judges and the appellate courts called on to review these decisions. Without such an opportunity, we cannot perform our function of determining whether immigration judges have properly discharged their responsibility of considering the asylum seekers' explanations. In this regard, we stress that our deference to an IJ's credibility determination is premised on the unique vantage point of immigration judges. *See Zhou Yun Zhang*, 386 F.3d at 73 ("[W]e afford 'particular deference' in applying the substantial evidence standard, mindful that ... the IJ has the unique advantage among all officials involved in the process of having heard directly from the applicant."). Immigration judges' position in the adjudicative process gives them a chance, unavailable at any other stage or to any other decisionmaker, to probe an applicant's testimony by posing questions and soliciting clarifications. And when, despite that "unique advantage," an IJ fails to produce a complete and detailed record, the justification for deferring to the IJ's findings is substantially diminished. Asylum appeals are obviously not suited to inquiries into how an applicant might have reconciled seemingly inconsistent testimony. Indeed, it is no more our function to supply a justification for an IJ's decision that the IJ does not himself articulate,[16] than it is our

---

**15.** In *Xiao Ji Chen*, we recently suggested, in passing, that the *Cao He Lin* rule that an IJ affirmatively assess an alien's explanation for seemingly inconsistent testimony did not demand a searching or in-depth analysis of every proffered explanation, even those of limited significance: "Although we have stated that an IJ is required to 'take ... into account ... *significant* factual assertions' offered by a petitioner, *see Cao He Lin*, 428 F.3d at 403 (emphasis added), we have never required, and we do not require here, that an IJ expressly parse or refute on the record each and every one of a petitioner's purported explanations for testimonial inconsistencies or evidentiary gaps.... [T]he IJ need not engage in 'robotic incantations' to make clear that he has considered and rejected a petitioner's proffered explanation." *Xiao Ji Chen*, 434 F.3d at 159 n. 13. But, the requirement of explicitness, *vel non*, in an IJ's refutation does not alter the fact that, in order for an IJ to conduct an *evaluation* of an alien's explana-

tions (whether these are or are not later expressly discussed in the IJ's opinion), the alien must be given the opportunity to submit these explanations for the IJ's review. Indeed, *Xiao Ji Chen* itself, after observing that the applicant was "confronted with [the] inconsistency," recounted the explanation the applicant stated in response. *See Xiao Ji Chen*, 434 F.3d at 159 n. 13.

**16.** *See Cao He Lin*, 428 F.3d at 400 ("[W]e will limit our review of the IJ's decision to the reasons she actually articulates and ordinarily will not affirm based on evidence that may appear in the record but that was not relied on in the IJ's decision because we cannot know how the IJ would have viewed evidence she did not analyze. To assume a hypothetical basis for the IJ's determination, even one based in the record, would usurp her role." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("For purposes of affirming no less than reversing its

place to insert plausible explanations for testimony that an IJ found incredible. *See Zhou Yun Zhang*, 386 F.3d at 77 ("[I]t is not our task to see if [petitioner's] inconsistent statements can somehow be reconciled."). Rather, it is the IJ's duty to make sure that the record we review includes *both* the alien's explanation for any non-"dramatic" discrepancies, on the one hand, and the IJ's reasons for rejecting "significant" explanations, on the other.[17]

■ Consonant, therefore, (1) with the unique role of fact finding that has been reserved to immigration judges, (2) with our holdings—in the contexts of insufficient corroboration and vague or too spare testimony—that administrative decisionmakers must give applicants an opportunity to correct the alleged defects in their testimony, and (3) with the requirement that immigration judges must explicitly

consider and evaluate an asylum seeker's proffered explanation for perceived testimonial discrepancies, we today hold that an IJ may not rest an adverse credibility finding on non-dramatic putative contradictions or incongruities in an alien's narrative without first giving the applicant a chance to reconcile the testimony.[18] In applying this rule, a reviewing court should determine, for each discrepancy on which the IJ's adverse credibility finding was based, first, whether, as in *Majidi*, the relevant inconsistency was plainly self-evident so that identification of it was not needed to make the alien cognizant of the defect, and, second, where the putative contradiction was not self-evident, whether the IJ, by identifying the inconsistency, afforded the alien an opportunity to attempt to reconcile it.[19]

\* \* \* \* \* \*

---

orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency.'"))).

17. *See supra* note 15. In addition, we should bear in mind that the language barriers, often present in asylum proceedings, (1) may make it more difficult for an alien to divine the precise concerns of an IJ and (2) may make applicants more reluctant to volunteer information for which they were not asked. Thus, in the instant case, Xue's lawyer pointed out that his client was actually from the Fu Chin region of the Fujian province, and that Xue might encounter some difficulty with the translator, who spoke Foo Chow, a related but distinct dialect. Though there is no clear evidence that language impacted Xue's ability to testify in this case, we should nonetheless be aware of the translation-related difficulties that may "chill" if not distort both an asylum seeker's initial testimony and his ability to discern and address an IJ's unannounced concerns. *See Zhen Li Iao*, 400 F.3d at 534 (noting the "[i]nsensitivity to the possibility of misunderstandings caused by the use of translators of difficult languages such as Chinese" as a recurring problem in immigration cases).

18. An IJ's responsibility to identify, in advance of judgment, perceived inconsistencies, is not tantamount to a duty to assist the counseled asylum applicant in putting forward an affirmative asylum claim in the first place. Imposing such an obligation implicates broader issues that we need not—and therefore do not—decide. We note, however, that several other circuits have expressly rejected any such duty. *See, e.g., Debab v. INS*, 163 F.3d 21, 26 (1st Cir.1998) (rejecting petitioner's argument that the IJ should have asked him questions that may have yielded answers that would have filled the missing gaps in the affirmative case that the applicant would have needed to present in order to satisfy his burden of proof); *Diaz–Escobar v. INS*, 782 F.2d 1488, 1493 (9th Cir.1986) ("The substantial evidence standard of review does not require the INS to produce any evidence at all if the alien does not independently satisfy his burden initially. If it did, it would clearly be a usurpation of Congress' authority to allocate the burden of proof to the alien." (internal citation omitted)).

19. The requirement we establish today will not, in the ordinary course, require an IJ to commence additional proceedings after an initial asylum hearing. Where an IJ identifies

With these considerations in mind, we turn to the professed inconsistencies in the case before us. The first argument on which the IJ's adverse credibility finding was based involved a perceived contradiction between Xue's assertion that he wanted to have a second child to help with farm work and his later testimony that he gave his second child to another family to be raised. It is true, as respondent argues, that "there was no explanation provided for this inconsistency in the record." But it is unclear that Xue—or anyone else for that matter—thought that an explanation was needed until the IJ announced his decision. Admittedly, the two attestations that create the discrepancy in the IJ's view are contained in the record. But, the statements do not constitute "dramatically different" accounts of the alleged persecution. Nor is there anything intrinsically incoherent in petitioner's assertions. Being forced to give a child away seems, on its face, to be consistent with Xue's claimed fear of persecution, and had petitioner been presented with an opportunity to clarify his testimony, he might very well have resolved (in any number of ways) what the IJ—not implausibly—describes as a paradox. It is, of course, not our job to specify the possible ways in which petitioner could have tried to reconcile his family's ultimate decision to give away their second child with their initial decision to conceive a child in the hopes of having additional help with their farming work. Such explanations are properly supplied by the applicant himself, with the aid of coun-sel, during asylum proceedings administered by an IJ. On appellate review, it is enough that plausible explanations are possible.

We emphasize that to give the applicant an *opportunity* to explain does not mean that the explanation proffered (if any) will be deemed valid or convincing. Thus, the IJ might have found—and, in fact, could find on remand—that the alien's explanation was not supported by substantial evidence or did not suffice to rectify the perceived contradiction, and was, for these or other reasons, unsatisfactory. And were we to find, on review, that the IJ's rejection of the applicant's explanation was supported by substantial evidence, we would have little difficulty affirming the IJ's decision. *See Cao He Lin*, 428 F.3d at 394 ("[W]e will not reject the IJ's factual findings if they are supported by substantial evidence, that is, if a reasonable fact-finder would not be compelled to make contrary findings."). Under the present circumstances, however, we are unable to conduct such a review. Because this first "inconsistency" was not self-evident, and because it was not raised as a matter of concern during the original hearings, we hold that it was error for the IJ to rely on it subsequently.

The second supposed discrepancy on which the IJ's decision depended is similarly flawed. To justify his credibility determination, the IJ juxtaposed two well-developed parts of petitioner's testimony— (1) that Xue's wife twice went into hiding

---

problems with an alien's testimony during the hearing itself, the IJ should, before rendering his decision, ask about the perceived inconsistency if the government has not brought it to the applicant's attention during cross-examination. If the IJ adjourns the hearing without announcing his judgment, and then comes across a possible inconsistency when reviewing the record, the IJ can simply request written briefing from the alien on the specific point. This is no different than an IJ "prob[ing] for incidental details" when an applicant has given "very spare testimony"— a practice we endorsed in *Jin Shui Qiu*. *See Jin Shui Qiu*, 329 F.3d at 152. Nor is it any more onerous than the common procedure of suspending and reconvening an asylum hearing to give aliens a chance to obtain and submit corroborative evidence that the IJ has requested.

and gave birth while in hiding, and (2) that Xue was subject to IUD checkups and was able to return to work after her pregnancy. On that basis, the IJ concluded that Xue's testimony was internally inconsistent and implausible. Had this concern been raised on direct or cross-examination, either by the government or by the IJ, and had petitioner failed to offer a satisfactory explanation, we might well conclude that the record contained substantial evidence to support the IJ's conclusion of a credibility-undermining inconsistency. But, like the first purported discrepancy, there is nothing to suggest that petitioner's testimony in these respects was self-evidently contradictory or inherently flawed such that the need to clarify was obvious. And here too, any number of possible, potentially plausible, explanations come to mind. Because petitioner had no opportunity to address the IJ's concerns, we conclude that this second set of inconsistencies relied on by the IJ was not a proper basis for his credibility ruling.

The third and final inconsistency significant to the IJ's decision rested on the IJ's belief that Xue's assertion that his wife was the victim of a forced sterilization was inconsistent, under the circumstances, with the State Department's account of how China enforces its family planning policies. Admittedly, the country profile includes descriptions of more passive enforcement techniques. But the report also acknowledges that rogue officials do, in fact, subject women to abortion and sterilization on occasion, and do so even though "the central government does not authorize physical force." It is not obvious upon inspection, therefore, that the country profile affirmatively contradicts Xue's narrative. But, even assuming that substantial evidence supports the perceived discrepancy, because the alleged inconsistency certainly is not self-evident, the IJ (or the INS) should have brought it to the alien's attention to ensure that Xue had an opportunity to explain why the profile did not undercut his account.

None of the incongruities in Xue's testimony that the IJ relied on were sufficiently glaring to relieve the IJ of his obligation to identify the perceived problems for the applicant and to give that asylum seeker an opportunity to reconcile his seemingly inconsistent testimony. Each of them allowed for a plausible explanation. As a result, even though—absent such an explanation—they support the IJ's conclusion, we find that an opportunity to explain should have been given to Xue. Because this was not done, we hold that the credibility determination was not supported by substantial evidence.

\*     \*     \*     \*     \*     \*

At the outset, we stressed that these cases are not games, and we should be careful not treat them as such. It would be to play games to insist intransigently that immigration judges call attention to clear discrepancies in an alien's testimony even when those contradictions were obvious to everyone. *See Xiao Ji Chen,* 434 F.3d at 159 n. 13 ("An IJ is not required to engage in 'robotic incantations.' ").[20] But

---

20. In this respect, we note that, in some cases (like *Majidi*), it will be uncontroversial that an inconsistency is adequately clear as to be self-evident. In other cases, however, the determination that a discrepancy is sufficiently significant and dramatic so that we may safely assume that everyone is aware of it will be a matter of judgment. And, we do not, in this opinion, mean to suggest that the line is pellucid. Under such circumstances—as we have observed in an analogous context—"[p]anels will have to do what judges always do ... apply their best judgment." *Ming Xia Chen,* 435 F.3d at 145. Hence, the facts of particular cases as parsed by particular panels will determine whether the purported inconsistencies were sufficiently obvious so that an adequate *de facto* opportunity was afforded to the

we would also be playing games if, when the putative inconsistencies were not patent, we nonetheless allowed immigration judges to declare testimony inconsistent without giving aliens a chance to explain.

For the foregoing reasons, we GRANT the petition for review, VACATE the decision below, and REMAND the case for further proceedings consistent with this opinion.

alien to address the problems in his asylum application, without having them called to his attention.