**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 12, 2006
Decided October 17, 2006

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 05-1706

| | |
|---|---|
| CORIOLAN OTRAVA,<br>        *Petitioner*, | Petition for Review of an Order of the<br>Board of Immigration Appeals |
|    *v.* | No. A95-585-345 |
| ALBERTO R. GONZALES,<br>        *Respondent*. | |

**O R D E R**

Coriolan Otrava, a citizen of Romania, petitions for review of a Board of Immigration Appeals' ("BIA") order summarily affirming the Immigration Judge's ("IJ") denial of his petition for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Mr. Otrava alleged that he was persecuted by Romanian police officers because he is a Rom, commonly known as a Gypsy. The IJ found that Mr. Otrava's account of abuse was vague and did not establish a basis for relief. On appeal Mr. Otrava argues that the IJ improperly called for corroboration and erred in relying on improper speculation about his experience in Romania. We deny the petition for review.

## Background

Mr. Otrava entered the United States in May 2002 on a B-1/B-2 temporary visa. *See* 22 C.F.R. § 41.31(a) (classifying temporary visas). Before his visa was due to expire, he applied for asylum and later received a Notice to Appear charging him with removal.

At his hearing, Mr. Otrava testified to events that led him to acquire the temporary visa. One night in March 2002, two men from a neighboring village showed up at his house in Piscari. They asked him whether he would sell his two daughters for $4,000 each. Mr. Otrava understood the men to be asking whether he would sell his daughters into prostitution, and he refused. The men then grabbed him by the neck and threatened to kidnap his daughters if he would not sell them. Frightened by this scene, Mr. Otrava's wife started screaming, and the two men left, swearing and repeating their threats as they went on their way.

Distressed, Mr. Otrava's wife urged him to go to the police station to report the incident. When he arrived, the police asked, "Hey, you Gypsy, why are you bothering us at this time of the night?" Otrava told them about the incident earlier that evening, and they invited him in. Once inside, the policemen began beating and punching him. Mr. Otrava testified that he was beaten so badly that he "fell down" and was "left in [that] position for about an hour and a half." When he regained consciousness, the officers tried to force him to sign a consent form stating that it was he, Otrava, who wanted to sell his daughters. He refused, and they beat him up again, leaving him "shivering, almost frozen" in a cold room overnight. The next morning the officers told him to go to the doctor and then report back to the station. They told him that if he did not return, they would "make sure that things would get worse."

Mr. Otrava's condition upon his return home prompted his wife to suggest moving. She said they should pick up a few things and move from Piscari to her parents' house in Satmarel, a village forty kilometers away. Mr. Otrava asked his nephew to drive them in his carriage to Satmarel, and he did, steering clear of the police station along the way. In Satmarel Mr. Otrava came into contact with a former colleague who helped him get a visa to leave the country. His wife arrived in the United States five months later, but his daughters (disguised as boys to avoid being sold into prostitution) remained in Satmarel. Back in Piscari, Mr. Otrava has been informed, the police are still looking for him.

Mr. Otrava also testified about other encounters with the police as he worked selling merchandise at local trade fairs. Once, at a fair in 2000, the police came, identified him as a Gypsy, then beat him up and took his merchandise. At an auto fair in 1997, the police asked for his identification and then fined him more money

than he could earn selling the merchandise. In 1992 the police identified him as a Gypsy, hit him, and detained him at the police station for two days.

The IJ denied Mr. Otrava's application for relief because she found his testimony of being beaten by police too vague to support his claim of persecution. Alternatively, the IJ concluded that the incidents did not rise to the level of persecution. The IJ did not discredit Mr. Otrava's testimony but questioned why he did not submit medical records of being beaten by the Romanian police or an affidavit from his wife corroborating his testimony. The IJ noted that the U.S. Department of State's 2002 Country Report on Romania reflected the country's enhanced efforts to protect minorities, including the Roma, and that both the ruling party and the party representing the Roma had signed a protocol to protect and educate the public about the Roma. Also, the IJ noted that violence by rogue police officers was being carefully monitored. In light of these developments, the IJ determined that Otrava could not have a well-founded fear of future persecution in Romania. The IJ commented that Mr. Otrava's departure from Romania seemed to be motivated by economic reasons, given that he was unemployed there but found a job within three days of his arrival here. Since Otrava did not meet the lower burden of proof required for asylum, the IJ concluded that he could not meet the more stringent standard for withholding of removal. Finally, the IJ concluded that Otrava had not presented sufficient evidence to support his claim that he would be tortured by the Romanian government if he were returned.

Mr. Otrava appealed to the BIA, arguing that the IJ improperly called for corroboration of his injuries and his Romani ethnicity. The BIA summarily affirmed the IJ's decision.[1]

## Discussion

Mr. Otrava has advanced two principal arguments in his petition for review. His first is a renewed contention that the IJ improperly called for corroboration of his injuries and ethnicity. Essentially, he understands the IJ to have denied his application because he failed to provide corroboration. He relies on cases like *Georgis v. Ashcroft*, 328 F.3d 962, 969 (7th Cir. 2003), for the proposition that when an applicant testifies credibly, corroboration is unnecessary.

---

[1]    Mr. Otrava also moved to reopen his case before the BIA. That motion was denied on June 2, 2005, and Mr. Otrava did not appeal from that decision. He nevertheless referenced the June 2 decision in the jurisdictional statement of his opening brief to this court, prompting the government to move for clarification of jurisdiction. Mr. Otrava has since clarified the question of this court's jurisdiction when he conceded that the June 2 decision is not before the court in this petition.

But Mr. Otrava misinterprets the IJ's decision. The IJ did not deny his application for lack of corroboration; rather, she found that he had not met his burden of proof because his testimony was too vague to support a finding of past persecution or, alternatively, that the incidents he recounted did not rise to the level of persecution. The IJ's reference to the lack of corroboration is somewhat troubling in light of our repeated pronouncements that corroboration is not required of otherwise credible applicants for asylum who filed their applications before the REAL ID Act took effect (like Mr. Otrava). *See, e.g.*, *Diallo v. Gonzales*, 439 F.3d 764, 766 & n.1 (7th Cir. 2006). We are also troubled by the IJ's inference that Mr. Otrava's entry into this country was primarily for economic reasons because he was unemployed in Romania. The IJ did not discredit Mr. Otrava's testimony, and although he testified to having difficulty finding permanent employment, he said he made a living as a trader selling merchandise at fairs. But taken as a whole, the IJ's opinion reflects that her primary concern was not (as Otrava suggests) a lack of corroboration or credibility so much as a need for Mr. Otrava's claim to be sharpened and clarified. Indeed, the IJ's conclusion was that Mr. Otrava's vague and overly generalized allegations were insufficient to satisfy his burden of proof. *See Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003) (finding burden of proof not satisfied where petitioner's allegations of being detained, beaten, and held for three days without food lacked specifics). Alternatively, the IJ concluded that the incidents Otrava described did not rise to the level of persecution. We cannot say the record compels a different conclusion. *Bolsgun v. Ashcroft*, 374 F.3d 452, 498 (7th Cir. 2004).

Mr. Otrava's second argument is difficult to discern. We do not understand him to be arguing that he offered sufficient evidence to entitle him to asylum; indeed, he concedes at least eight times in his brief that his testimony was "incomplete" or "insufficient." Instead, he argues that the IJ erred in relying on her own speculations and should have developed the record if she found it lacking in detail.

This argument falters for several reasons, the first of which is that it is undeveloped. To avoid jurisdictional problems, applicants must properly present their arguments first to the BIA. *See Toptchev v. INS*, 295 F.3d 714, 721 (7th Cir. 2002). Here, Otrava's notice of appeal to the BIA does not refer to the IJ's failure to develop the record; it challenges only what Mr. Otrava saw as an improper demand for corroboration. Nor does Mr. Otrava's brief to this court cite any legal authority for the proposition that an IJ has a duty to develop the facts in a removal hearing. By not developing such an argument in his petition to this court, Mr. Otrava has waived the argument. *See Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) (noting that failure to develop arguments on appeal constitutes waiver); *accord Makhoul v. Ashcroft,* 387 F.3d 75, 82 (1st Cir. 2004) (enunciating the same principle in immigration context).

In any event, the issue of an IJ's duty to develop the record is not squarely implicated in this case because Mr. Otrava was represented by counsel. While the immigration regulations place the burden of proof on the applicant for asylum, 8 C.F.R. § 208.13(a); *Sosnovskaia v. Gonzales,* 421 F.3d 589, 593 (7th Cir. 2005), the Immigration and Nationality Act provides that an IJ shall "receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses," 8 U.S.C. § 1229a(b)(1). An alien represented by counsel, however, is entitled to less assistance from the IJ than a pro se applicant. *See Al Khouri v. Ashcroft*, 362 F.3d 461, 464-65 (8th Cir. 2004); *Jacinto v. INS*, 208 F.3d 725, 733-34 (9th Cir. 2000); *see also Ming Shi Xue v. BIA,* 439 F.3d 111, 125 n.18 (2d Cir. 2006) (noting that IJ's duty to develop the record does not amount to "assist[ing] the counseled asylum applicant in putting forward an affirmative asylum claim in the first place"). Thus, even were we to reach this issue despite its lack of development by either party, we would not be inclined to hold that the IJ breached her duty under 8 U.S.C. § 1229a(b)(1) because Mr. Otrava was represented by counsel at his hearing.

Mr. Otrava's last argument is that the IJ erred in not placing the burden on the government to rebut the presumption of a fear of future persecution. However, only when an applicant has established past persecution does the burden of rebutting future persecution shift to the government. *See* 8 C.F.R. § 208.13(b)(1)(ii); *Cecaj v. Gonzales*, 440 F.3d 897, 900 (7th Cir. 2006). Mr. Otrava wrongly assumes that he established past persecution.

Accordingly, we DENY the petition for review.