**ZHI WEI PANG, Petitioner,**

v.

**BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES, Respondent.**

**Docket No. 03–40333.**

United States Court of Appeals, Second Circuit.

Argued: Feb. 27, 2006.

Decided: May 3, 2006.

Joshua Bardavid (Theodore N. Cox, on the brief), New York, New York, for Petitioner.

Linda R. Anderson, Assistant United States Attorney (Dunn Lampton, United States Attorney for the Southern District of Mississippi, on the brief), Jackson, Mississippi, for Respondent.

Before: SOTOMAYOR and RAGGI, Circuit Judges, and CEDARBAUM,* District Judge.

Judge RAGGI concurs in a separate opinion.

CEDARBAUM, District Judge:

Petitioner Zhi Wei Pang, a citizen of the People's Republic of China, petitions for review of a July 24, 2003 order of the Board of Immigration Appeals ("BIA") affirming the order of Immigration Judge Roxanne C. Hladylowycz (the "IJ") denying petitioner's request for asylum under section 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158, and for withholding of removal pursuant to INA Section 241(b)(3), 8 U.S.C. § 1231(b)(3). Pang argues that the IJ erred by relying on a number of improper grounds in making an adverse credibility finding. The questions presented on this petition for

* The Honorable Miriam Goldman Cedarbaum, United States District Judge for the Southern District of New York, sitting by designation.

review are: (1) whether the IJ erred in relying on inconsistencies arising from an asylum application that was neither signed by the preparer nor sworn to by the applicant before an immigration official as a basis for reaching an adverse credibility determination without considering evidence that the applicant did not know the application's contents; (2) whether the IJ gave the applicant adequate opportunity to address what the IJ viewed as inconsistencies in the applicant's testimony. We hold that the IJ erred. We grant the petition for review and remand to the BIA because we cannot predict that the IJ would reach the same adverse credibility determination absent the errors that were made.

## I. BACKGROUND

Pang arrived in the United States on May 15, 1993. In August of that year, Pang filed his first asylum application. After an initial immigration proceeding in October 1996, Pang's asylum hearing was adjourned on a number of occasions. Pang had two A numbers, the first of which was opened upon his arrival in the United States near Calexico, California and the second of which was opened when he applied for asylum and withholding of removal. The confusion arising from these two numbers contributed to the delay in adjudicating Pang's case. Pang completed a second I–589 application for asylum and withholding of removal on May 28, 2000, shortly before his asylum hearing. He affirmed that application, but not his originally filed I–589, at an asylum hearing on June 20, 2000. Pang sought relief based on his contention that his wife had been forcibly sterilized after the birth of their second child, that they had been harassed and fined, and that he feared further persecution if he were returned to China.

According to Pang's testimony before the IJ, Pang's first child, a daughter, was born on November 24, 1988. Soon after the birth of their child, Pang and his wife were visited by family planning authorities. Pang's family was allowed only one child under the family planning policy, and the authorities required Pang's wife to have an intrauterine device ("IUD") inserted. The couple, however, strongly desired a son, and so Pang and his wife paid a private physician to remove the IUD. Soon after the IUD was removed, Pang's wife became pregnant again. Several months later, as the pregnancy became visible, authorities arrived at Pang's house and ordered his wife to report for an abortion. Pang and his wife, who had relatives visiting them at the time, convinced the authorities to permit them to report for the abortion the next morning. Instead, they fled to a relative's house several hours away.

They remained away from home for the duration of the pregnancy, and their second child was born in a government hospital near the house in which they were hiding. Several days after Pang and his wife returned home, the authorities arrived and forcibly took his wife to undergo a sterilization procedure. In addition to the forced sterilization, the couple was fined 3000 Yuan for having more than one child. Unable to pay the entire fine, Pang and his wife paid 1500 Yuan using money borrowed from friends and relatives. Family planning officials subsequently confiscated a television and a VCR from Pang's house. The authorities ultimately allowed Pang to register his second child in the household registration booklet. Additionally, the sterilization of Pang's wife was poorly performed, and she became pregnant a third time. That pregnancy was ectopic, non-viable, and dangerous to his wife's health. She underwent a medical procedure to end the dangerous pregnancy and correct the initial sterilization.

After his wife's health improved, Pang left China for the United States.

The IJ denied Pang's application based on an adverse credibility finding. The IJ supported that finding with approximately eight aspects of Pang's testimony which the IJ labeled as inconsistent or implausible. The BIA affirmed the IJ's ruling without opinion.

Pang challenges the adverse credibility finding, which formed the sole basis for the IJ's denial of his application. The eight inconsistencies identified by the IJ may be classified into two categories. First, there were several alleged inconsistencies between the statements Pang made in his 1993 application for asylum and the statements he made in his second application and at the hearing. Secondly, the IJ found that there were several other inconsistencies between Pang's testimony at the hearing and the statements in his second application, that certain aspects of Pang's testimony were implausible, and that Pang had omitted some significant facts from his written application. Pang argues that the IJ's findings were based on speculation, conjecture, and flawed reasoning.

## II. DISCUSSION

In cases like this, in which the BIA affirms the IJ's order without opinion, we review the order of the IJ directly. *Secaida–Rosales v. INS*, 331 F.3d 297, 305 (2d Cir.2003). Furthermore, our review is confined to the reasons given by the IJ, and we will not search the record for alternative reasons to affirm the decision of the BIA. *Id.*

We review an IJ's factual findings under the substantial evidence standard, reversing only if a reasonable fact finder would be compelled to reach a contrary conclusion. *Zhou Yun Zhang v. INS*, 386 F.3d 66, 73 (2d Cir.2004). We vacate the IJ's decision, however, when the IJ's finding is based on an error of law or when the findings are not supported by evidence in the record. *Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 149 (2d Cir.2003). The fact that an IJ or the BIA relied solely on an adverse credibility finding in dismissing an application does not insulate the decision from review. *Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir. 2004). An adverse credibility finding must be based on specific, clear reasons with a legitimate nexus to the finding. *Secaida–Rosales*, 331 F.3d at 307. Inconsistent testimony can, by itself, support an adverse credibility finding, but not if the inconsistencies are minor, isolated, or peripherally related to the claim. *Diallo v. INS*, 232 F.3d 279, 288 (2d Cir.2000). Adverse credibility findings are improper and may be overturned when they are based on speculation, conjecture, or flawed reasoning. *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 400 (2d Cir.2005). Adverse credibility findings may also be overturned when the applicant is not given an opportunity to explain "non-dramatic putative contradictions or incongruities" in his narrative. *Ming Shi Xue v. BIA*, 439 F.3d 111, 125 (2d Cir.2006)

### A. THE 1993 ASYLUM APPLICATION

At the hearing, Pang argued that the statements in his 1993 application for asylum were inaccurate in several respects. The fifth page of the 1993 application includes lines for three signatures. The first line requires the signature of the applicant certifying under penalty of perjury that the information in the application is true. The second line requires the signature of the preparer and certifies that the application has been read back to the applicant in his native language. The third line requires the applicant to take an oath and sign the application in front of an

Asylum Officer or an Immigration Judge. The applicable regulation states that the application must be signed by the applicant and the preparer under penalty of perjury. 8 C.F.R. § 208.3(c)(2). The regulation further provides that the "applicant's signature establishes a presumption that the applicant is aware of the contents of the application." 8 C.F.R. § 208.3(c)(2). Pang's 1993 application contains his signature only on the first line. The portion which requires that he sign and swear to the application in front of an immigration official is blank. In addition, the line for the preparer's sworn representation that the application was read to the applicant for verification is also blank. But because Pang signed the first signature line under penalty of perjury, the presumption of § 208.3(c)(2) was triggered.

Pang testified that no one had ever read him the contents of the 1993 application and that he had signed it because the preparer told him to sign it. He further testified that some of the information contained in the 1993 application was incorrect and that the preparer had incorrectly reported aspects of his story.

■ While the fact that the 1993 application lacked several signatures does not make it unreliable *per se*, it does support Pang's claim that the application was improperly prepared in other respects. Pang's testimony is plausible, and if credited by the IJ it would have rebutted the presumption that Pang was aware of the application's contents. The IJ, however, did not consider Pang's explanation and did not make any findings as to the accuracy of the 1993 application or as to the weight the statements in the application should be given. Although the IJ is not required to credit Pang's explanation, the IJ is required to present specific, cogent reasons for rejecting it. *Ramsameachire*, 357 F.3d at 178. Absent a reasoned evalu-

ation of Pang's explanations and the application's facial deficiencies, the IJ's reliance on inconsistencies arising from that application cannot constitute substantial evidence in support of an adverse credibility finding. *Cao He Lin*, 428 F.3d at 403. The IJ gave no indication that she considered Pang's testimony on the 1993 application, and we cannot assume that the IJ considered factors that she failed to mention in her decision. *Anderson v. McElroy*, 953 F.2d 803, 806 (2d Cir.1992).

■ The Third Circuit has reached a substantially similar conclusion. In *Gui Cun Liu v. Ashcroft*, 372 F.3d 529 (3d Cir.2004), that court faulted an IJ for failing to consider whether the presumption of § 208.3(c)(2) had been rebutted by the preparer's failure to sign the form, the petitioner's testimony that he did not know the application's contents, and the fact that the petitioner's statement was in English, a language which the petitioner did not speak. *Id.* at 534. We join the Third Circuit in holding that when a petitioner challenges the accuracy of the contents of his I–589 application that was signed under penalty of perjury, the IJ must evaluate the petitioner's explanations and determine whether the presumption of 8 C.F.R. § 208.3(c)(2) has been rebutted.

## B. THE IJ's OTHER FINDINGS

In addition to evidence gleaned from the 1993 application, the IJ identified several other purported testimonial flaws in making her adverse credibility finding. All of these purported flaws were either insubstantial or misidentified.

### 1. IUD CHECKUPS

■ In her oral decision, the IJ noted inconsistencies in Pang's testimony about his wife's IUD. The IJ stated "it is very clear that the respondent indicated

earlier today that his wife *had been scheduled* for IUD checkups and that she missed the *scheduled* IUD checkup. However, later today when I asked the respondent again the same question about IUD checkups, he indicated, no, his wife never had an IUD checkup, and she was never scheduled for an IUD checkup." (emphasis added). The record, however, does not indicate any discrepancy. In his testimony, Pang never used the word "scheduled." At one point in his testimony, Pang stated that his wife "did not report" for IUD checkups, and at a later point he indicated that his wife was never scheduled for IUD exams by stating that she had never "reported for such an IUD inspection" because the doctors had not required it. These statements are not inconsistent. The record does not show that Pang ever testified that his wife had missed a scheduled checkup. The IJ appears to have drawn the conclusion that Pang's wife had been scheduled for a checkup, and had missed a checkup, from the translator's use of the word "report." The translator, however, used that word both to explain that Pang's wife "did not *report* for this [IUD] checkup" and to specify that "I don't believe my wife has ever *reported* for such an IUD inspection, but only the doctors have reminded us, if everything goes well, you don't need to come back for any inspection." Although there may be routine scheduled IUD checkups in China, as the concurring opinion suggests, Pang's use of the word "report" to explain that his wife had never been scheduled for an IUD checkup seriously undermines the IJ's inference from Pang's earlier use of that word that Pang meant that his wife had been scheduled for a checkup. On the record before us, it is clear that the IJ put words into Pang's mouth, interpreting his statement that his wife had not "report[ed] for this checkup" to mean that his wife had not "reported for an IUD checkup when

scheduled." Although we do not choose among possible interpretations of the facts, we need not accept an IJ's clear misinterpretation of testimony. *See Zhou Yun Zhang,* 386 F.3d at 74 (noting that "our review is meant to ensure that credibility findings are based upon neither a misstatement of the facts in the record nor bald speculation or caprice.")

## 2. THE PANGS' FLIGHT

■ The IJ indicated that it made "absolutely no sense" that the Pangs would have stayed in their home village into the second trimester of the pregnancy. The IJ noted that Pang and his wife "apparently did nothing to protect this pregnancy, when they claim that they, in fact, wanted this child to be born." The record, however, does not support this finding, which is based on impermissible conjecture and is undermined by the IJ's failure to develop the record.

■ Although the government asked Pang several questions about going into hiding with his wife, the relevant questions on cross-examination were general and exploratory in nature. Neither the IJ nor the government indicated that they found anything unsatisfactory or implausible in Pang's response on this point, nor should the questions have put Pang on notice that the IJ found his testimony insufficiently detailed or lacking in credibility. When putative inconsistencies or implausibilities are not dramatic and the need to clarify is not obvious, an IJ has an obligation to inform the petitioner that his testimony is being viewed as potentially flawed, and the IJ must give the petitioner a chance to explain. *See Ming Shi Xue,* 439 F.3d at 125 (holding that "an IJ may not rest an adverse credibility finding on non-dramatic putative contradictions or incongruities in an alien's narrative without first giving the applicant a chance to rec-

oncile the testimony"). As we recently noted, "[w]ithout this requirement, asylum applicants would frequently be denied the opportunity to clarify genuinely consistent testimony that the IJ has unwittingly misconstrued. And, conversely, immigration judges could prematurely decide that testimony is inconsistent when, in fact, the purported discrepancies readily admit of explanation which the IJ would find valid." *Id.* at 122. This requirement does not mean that the IJ must duplicate the questions of the government when the government has already noted testimonial flaws on cross-examination. But when the government's cross-examination does not put the applicant on notice of a putative flaw, the government's cross-examination cannot absolve the IJ of the responsibility to make the applicant aware that an explanation is necessary.

Nothing in the record indicates that there is any reason for family planning officials to have known about Pang's wife's pregnancy during its early stages. In fact, Pang testified that his wife was "just slightly showing" at the time officials came to their house to inquire about the pregnancy. It is not clear what steps, if any, the Pangs should have taken to "protect the pregnancy" during the period when the pregnancy was not visible. The IJ's assumption that most people in Pang's position would have fled at an earlier point is not self-evident and is not supported by record evidence. That assumption seems to reflect what the IJ imagined she would have done in the circumstances and not a finding based on reliable generalizations about human nature. Immediate flight, in the circumstances presented here, is not such a universal human impulse that the failure to flee immediately can be automatically considered suspect.

Here, Pang was asked only if he and his wife took "any steps to avoid family plan-

ning officials" during his wife's second pregnancy. He responded that he and his wife had left home. Any purported flaw in Pang's testimony was not dramatic enough that the IJ was relieved from the obligation to put Pang on notice of the putative flaw and give him a chance to respond.

## 3. THE DELIVERY OF PANG'S SON

Pang testified that his wife gave birth to their second child at a government hospital outside of their home district and that family planning officials had not created problems for them at the hospital. The IJ found Pang's testimony implausible, but not for the reason suggested by the concurrence—that it was implausible for hospital employees to fail to inquire about Pang's wife's identity, her marital and family status, or her residence given that China has a highly regulated society. Questions or concerns about what hospital employees asked the Pangs were not posed at the immigration hearing, and the IJ did not rely on this point in making an adverse credibility finding. We limit our review of an IJ's decision to the reasons the IJ articulates. *Cao He Lin,* 428 F.3d at 400.

The IJ based her finding on two issues. First, the IJ opined that a "child cannot be born in China in a government hospital without a birth permit." The IJ failed to cite any materials, reports, or personal knowledge to support this conclusion, and it is not obvious that a hospital would refuse to deliver a baby without proof that the birth did not violate family planning quotas. This finding is speculative and is not supported by substantial evidence.

Second, the IJ observed that "no cadre officials created any problems from the hospital for this respondent after the birth." Implicit in that conclusion was the assumption that family planning officials would have been present at the hospital or

that the Pangs remained there long enough to be discovered by them. The role family planning officials play in the hospital setting was not addressed at the hearing. No evidence on the topic was placed in the record. To the extent that the IJ found it implausible that *hospital employees* did not ask the Pangs detailed questions, Pang did not address this topic in his testimony and was not asked about the topic by the IJ. To the extent that the IJ found it implausible that *family planning cadres* did not cause trouble at the birth of Pang's child, the record contains no evidence that family planning cadres can be expected to cause trouble at the hospital. The record does not provide reasons to treat hospital employees and family planning cadres as interchangeable subjects, and the role that each plays in the hospital setting is not obvious. As it stands, the IJ's finding was not supported by the evidence. Even if the finding did have some support in the record, the putative flaw in Pang's testimony is not dramatic enough that the IJ was relieved from the obligation to inform Pang of the putative flaw and give him a chance to respond.

### 4. THE 3000 YUAN FINE

■ Pang's application states that he was fined 3000 Yuan and that he paid half the fine. The IJ noted that, at the hearing, Pang initially testified that he had paid only 1500 Yuan. When questioned, Pang explained his testimony and said that he had been fined 3000 Yuan but paid only 1500 Yuan. The IJ did not find this testimony, in itself, inconsistent, but instead concluded that it was implausible that Pang's second child would have been registered in the household booklet if the couple had paid only half of the 3000 Yuan fine. The IJ cited no evidence to support the conclusion that a child could not be registered after only partial payment of a

fine. Although the Department of State report does indicate that children "in excess of family planning quotas" cannot be legally registered until a family has been fined, that report is silent as to whether partial payment, or any payment at all, is a prerequisite to registration. *Id.* at 128. The IJ did not inquire of Pang whether the partial payment of the fine satisfied the authorities. Nor did the IJ consider whether Pang's possessions had been confiscated in satisfaction of the fine. The IJ did not inform Pang that his testimony was being viewed as inconsistent or incredible, and the testimony was not obviously contradictory. Without some support in the record, the IJ's finding on this issue also was based on impermissible conjecture.

* * *

■ An IJ has an affirmative obligation to help develop the record in immigration proceedings. *Secaida–Rosales,* 331 F.3d at 306. An IJ also has an obligation to give a petitioner a chance to clarify non-dramatic contradictions and implausibilities. *Ming Shi Xue,* 439 F.3d at 125. We have noted that giving a petitioner the opportunity to explain purported testimonial flaws does not mean that the explanation must be credited. *Id.* at 126. A properly developed record, however, might have revealed enough facts to allow the IJ to determine that discrepancies existed without resorting to speculation and conjecture, or it might have convinced the IJ that the putative testimonial flaws did not actually exist. As the record stands, however, many of the discrepancies the IJ noted were not supported by substantial evidence.

### 5. MINOR AND COLLATERAL OMISSIONS

■ Finally, the IJ based the adverse credibility finding on three omissions in

Pang's second application. At the hearing, Pang testified that (1) he and his wife went into hiding together; (2) after the birth of his second child, Chinese authorities had removed possessions from his home; and (3) his wife had a third, life-threatening pregnancy due to an improper sterilization procedure. The IJ noted that Pang's application mentioned that his wife had gone into hiding but did not mention that Pang had gone with her. Similarly, the application failed to mention the removal of possessions from Pang's home and his wife's ectopic pregnancy.

■■■ We have recognized that "the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding, and that holding applicants to such a standard is not only unrealistic but also unfair." *Secaida–Rosales,* 331 F.3d at 308. The confiscation of possessions and ectopic pregnancy are indications of the hardship that China's family planning policies caused Pang, but they are ancillary to the heart of Pang's claim, which concerns the circumstances giving rise to his wife's forced sterilization. Similarly, it is questionable whether Pang's omission about hiding with his wife "goes to the heart of [Pang's] broader claim to asylum." *Id.* at 309. This omission is not as significant as it would be if Pang were making a claim for *direct* persecution because of his political views, rather than for *constructive* persecution. We note that evidentiary discrepancies that are of less than substantial importance, such as these, "cannot form the sole basis for an adverse credibility finding," *id.* at 308 (citation and internal quotation marks omitted), and therefore conclude that none of these three findings could independently constitute substantial evidence supporting the IJ's ultimate conclusion. Even if the latter omission were

significant, however, we could not predict that the IJ would reach the same result based on this factor alone. *See Xiao Ji Chen v. U.S. Dep't of Justice,* 434 F.3d 144, 158 (2d Cir.2006)(stating that we may affirm a decision of the BIA where we can predict that, despite any errors, the IJ would reach the same decision on remand).

\* \* \*

In reaching her adverse credibility determination, the IJ failed to consider all of the probative evidence in the record, mischaracterized Pang's testimony, and relied on speculation and minor omissions from Pang's asylum application. In light of these errors, we cannot predict that the IJ would reach the same result in this case on remand. Remand is thus appropriate.

## CONCLUSION

For the foregoing reasons, we GRANT the petition for review and REMAND to the BIA for further proceedings consistent with this opinion.

REENA RAGGI, concurring in part and concurring in the judgment.

I concur in the court's decision to grant the petition for review in this case and to remand for further proceedings to permit the Immigration Judge ("IJ") to make specific findings as to whether petitioner Zhi Wei Pang adequately rebutted the presumption established by 8 C.F.R. § 208.3(c)(2) that he was aware of the contents of his 1993 asylum application. Thus, I join in Parts I and IIA of the majority decision. Nevertheless, because I do not agree with the majority's wholesale criticism of the IJ's other credibility-related findings, I must respectfully decline to join in Part IIB of the opinion.

1. *The Need for Further Findings on Rebuttal of the § 208.3(c)(2) Presumption*

Zhi Wei Pang, a Chinese national who entered the United States in May 1993, seeks relief from removal based on his wife's alleged forcible sterilization in 1990. *See Zhou Yun Zhang v. United States INS*, 386 F.3d 66, 71–72 (2d Cir.2004) (discussing recognition of derivative spousal claims). The IJ, in a decision subsequently upheld by the BIA, denied relief on a specific finding that petitioner was not credible in his claim of forced sterilization. We are, of course, obliged to defer to the factual findings of the BIA and the IJ if they are supported by substantial evidence. *See* 8 U.S.C. § 1252(b)(4)(B) (providing that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"); *see also Xiao Ji Chen v. United States Dep't of Justice*, 434 F.3d 144, 156–57 (2d Cir.2006); *Jian Xing Huang v. United States INS*, 421 F.3d 125, 128 (2d Cir.2005) (*per curiam*). Inconsistent statements by an asylum applicant about matters material to his claim of persecution generally constitute such substantial evidence. *See Zhou Yun Zhang v. United States INS*, 386 F.3d at 74; *see also Majidi v. Gonzales*, 430 F.3d 77, 80–81 (2d Cir.2005).

In this case, the IJ noted, and the record confirms, significant, obvious inconsistencies in petitioner's account of the alleged forcible sterilization between his 2001 hearing testimony and his 1993 asylum application. It is useful to identify these discrepancies.

At his asylum hearing, Pang testified that the sterilization occurred "[s]ometime in August—mid-August" of 1990 when government officials came to his home and, in his presence, forcibly removed his wife. Hearing Tr. 56. Pang explained that, ap-proximately a month earlier, on July 15, 1990, his wife had given birth to their second child, a son, in a government hospital near her brother's home in Fuzhou. Because the couple had conceived the boy in violation of government family planning restrictions, they had spent several months in hiding prior to the child's birth. In response to a direct question by his counsel, Pang stated that there had been "no problem at all" with family planning officials while his wife was at the hospital. *Id.* at 55. Within days of the couple and their children returning to their home village, however, five officials arrived at their home at "10 in the morning" and, despite his wife's resistance, "force[d] her out of the house and put her into one of these paddy cab and took her away" to be sterilized. *Id.*

By contrast, petitioner's 1993 asylum application stated that the sterilization had taken place while his wife was hospitalized in Fuzhou following the birth of their son: "In July, 1990, due to her difficult labor, my wife was sent to the hospital of the county and had a[ ] Caesarean birth. When my wife stayed in the hospital, the official forced her to have sterilization. It was so cruel treatment for my wife, she was very weak to refuse it." 1993 Asylum Application ¶ 18. These obvious discrepancies, which by themselves constitute substantial evidence supporting the IJ's adverse credibility ruling, *see Majidi v. Gonzales*, 430 F.3d at 80 (holding that dramatically different account of incident relating to persecution claim "offers substantial evidence in support of IJ's credibility ruling"), necessarily preclude us from concluding that the IJ was compelled to credit Pang's persecution claim, *see Zhou Yun Zhang v. United States INS*, 386 F.3d at 73–74.

On this appeal, however, Pang submits that the IJ erred in admitting his 1993 asylum application into evidence or in re-

lying on it to support an adverse credibility ruling. Like my colleagues in the majority, I conclude that, because petitioner acknowledges that he did sign the 1993 application, the document was properly received in evidence at the hearing and entitled to the presumption established by 8 C.F.R. § 208.3(c)(2) (recognizing that "applicant's signature establishes a presumption that the applicant is aware of the contents of the [asylum] application"). That presumption, however, is subject to rebuttal. Here, Pang attempted to rebut the regulatory presumption through his own testimony about the circumstances under which his 1993 asylum application was prepared. Specifically, he testified that the application was prepared for him by an agency without his having any idea as to its content. He stated that no one ever read the 1993 application to him. Agency representatives simply told him to sign the document. Upon subsequently discovering that this 1993 application was "quite a mess," Pang asked a law firm to help him prepare a second asylum application in 2000, although he testified that, once again, no one read the completed document to him. *Id.*

It is, of course, not the task of a reviewing court to weigh Pang's explanation for his lack of familiarity with the contents of his 1993 asylum application or to conclude that the explanation excuses any discrepancies between the application and petitioner's hearing testimony. *See generally Jin Yu Lin v. Dep't of Justice,* 413 F.3d 188, 190–91 (2d Cir.2005) (observing that reviewing court may not itself justify contradictions or explain away inconsistencies in the hearing record); *Zhou Yun Zhang v. United States INS,* 386 F.3d at 74 (same). But, where, as in this case, a petitioner offers an explanation to rebut the § 208.3(c)(2) presumption, we can require the IJ to make a specific record finding as to whether that presumption has or has not been satisfactorily rebutted.

*See Gui Cun Liu v. Ashcroft,* 372 F.3d 529, 534 (3d Cir.2004) (Alito, J.) (remanding petition because, *inter alia,* IJ failed to consider whether petitioner rebutted presumption under § 208.3). This is not to suggest that the IJ was here required to credit Pang's explanation, but only to note that we cannot responsibly decide whether the IJ's adverse credibility finding is fairly supported by substantial evidence absent such a determination. *See generally Cao He Lin v. United States Dep't of Justice,* 428 F.3d 391, 403 (2d Cir.2005).

Of course, as this court has recently observed, "an error does not require a remand if the remand would be pointless because it is clear that the agency would adhere to its prior decision in the absence of error." *Xiao Ji Chen v. United States Dep't of Justice,* 434 F.3d at 161; *see Cao He Lin v. United States Dep't of Justice,* 428 F.3d at 406. In this case, the IJ cited a number of collateral reasons, in addition to the discrepancies between the 1993 asylum application and Pang's hearing testimony, for questioning Pang's credibility. Nevertheless, because the IJ based her adverse credibility determination on inconsistencies between the 1993 asylum application and Pang's hearing testimony, which inconsistencies related to the forcible sterilization that was the crux of the persecution claim, I cannot confidently conclude that the IJ would have reached the same result had she found Pang to have rebutted the § 208.3(c)(2) presumption. *Cf. Xiao Ji Chen v. United States Dep't of Justice,* 434 F.3d at 162. Accordingly, I join the court in deciding to remand this case for further findings by the IJ.

2. *Other Factors Corroborating the IJ's Adverse ·Credibility Finding Are Adequately Supported by the Record*

To the extent the majority holds that none of the IJ's other grounds for ques-

tioning Pang's credibility is adequately supported by the record, I must respectfully disagree. Preliminarily, I observe that, while it is necessary to discuss these grounds individually, I do not here consider whether any one would alone support an adverse credibility finding sufficient to deny relief from removal. I consider only the majority's apparent conclusion that the IJ erred in giving any consideration to the identified factors in assessing Pang's credibility. While I share the majority's concerns with respect to record support for the IJ's implausibility finding relating to the registration of Pang's children (particularly his son) while part of a family planning fine remained unpaid, see ante at 111, in all other respects, I do not think the IJ erred in considering the identified factors in her overall assessment of Pang's credibility.

### a. Inconsistencies Regarding IUD Checkups

The majority concludes that the IJ erred in identifying an inconsistency in Pang's testimony about his wife's IUD checkups. The IJ found: "[I]t is very clear that the respondent indicated earlier today that his wife had been scheduled for IUD checkups and that she missed the scheduled IUD check-up. However, later today when I asked the respondent again the same question about IUD checkups, he indicated, no, his wife, never had an IUD checkup, and she was never scheduled for an IUD checkup." IJ Decision at 46. The majority concludes that the record evidences no such inconsistency. In responding to the IJ's inquiry, "Well, didn't your wife have IUD exams," Pang answered, "So after the IUD removal, she did not report for this checkup ...." Hearing Tr. 52. The majority holds that the IJ erred in inferring from Pang's use of the word "report" that he was referring to a scheduled checkup.

Without the benefit of having witnessed the exchange between the IJ and Pang on this point, I do not think this court can conclude that the IJ erred as a matter of law in her understanding of Pang's testimony. Pang's statement that his wife did not "report for this checkup," id. (emphasis added), could well have referenced the sort of routine scheduled IUD checkups about which we hear frequently in Chinese asylum cases. See, e.g., Yu Yin Yang v. Gonzales, 431 F.3d 84, 85–86 (2d Cir.2005) (concluding that inconsistencies in petitioner's testimony regarding, inter alia, IUD checkups, supported IJ's adverse credibility determination); see also Xia J. Lin v. Ashcroft, 385 F.3d 748, 754 (7th Cir.2004) (referencing evidence of strict enforcement of IUD reliability checkups). Thus, whether Pang's subsequent testimony that his wife somehow never had any scheduled IUD checkups clarified or contradicted this first statement was properly considered by the IJ in her overall assessment of petitioner's credibility.

As we noted in Zhang, how a question and answer are understood by those present may differ significantly from how they appear to a reader on a cold printed page. See Zhou Yun Zhang v. United States INS, 386 F.3d at 73–74. Precisely because a reviewing court cannot glean from a transcript the demeanor and inflections that are critical to parties' understandings of each other's statements, our credibility review is narrowly circumscribed to ensuring that findings are not based on "a misstatement of the facts in the record [ ]or bald speculation or caprice." Id. at 74; see Borovikova v. United States Dep't of Justice, 435 F.3d 151, 156 (2d Cir.2006) ("Because asylum determinations require intensive factual determinations that appellate courts are ill-suited to conduct, our review of factual determinations by an IJ is tightly circumscribed."). We do not,

however, ourselves choose among possible interpretations of the facts.

Here, the IJ did not misstate the record. Rather, having heard Pang's testimony, the IJ reasonably construed Pang's statement about his wife "not report[ing] for this checkup" to reference acknowledgment of scheduled checkups. Although members of this court, who did not hear Pang's testimony, might construe the statements differently, in these circumstances, I think we are obliged to defer to the IJ. *See Zhou Yun Zhang v. United States INS,* 386 F.3d at 74 (noting that we cannot reverse agency determination simply because we disagree with its assessment of the facts); *see also Xiao Ji Chen v. United States Dep't of Justice,* 434 F.3d at 157–58 (stating that "our limited role as an appellate court does not permit us to engage in an independent evaluation of the cold record or ask ourselves whether, if we were sitting as fact-finders in the first instance, we would credit or discredit an applicant's testimony").

Although I am in the minority in my view of the IJ's identification of an inconsistency in Pang's IUD testimony, because the panel unanimously agrees that a remand is warranted in this case, I trust that my colleagues in the majority do not foreclose the IJ from further developing the record, either with respect to evidence or findings, on this or any other point relevant to Pang's credibility.

b. *The "No Sense" Finding About Pang's Delay in Concealing His Wife's Unauthorized Second Pregnancy*

Pang testified that, in 1989, after family planning officials required his wife to be fitted with an IUD following the birth of their first child, a daughter, the couple had the IUD removed in an effort to conceive a son. By the end of the year, Pang's wife was pregnant. Sometime in April or May 1990, family planning officials discovered the pregnancy and attempted to take Pang's wife for a forcible abortion. Pang claims that the couple was able to persuade the officials to allow Pang's wife to surrender for an abortion the following day. Rather than surrender, however, the couple fled, hiding for three to four months with a friend and, eventually, with Pang's wife's brother. Pang testified that his son was born at Fuzhou Number One Hospital, which was across the street from the brother's home.

The IJ declined to credit this account, observing that it made "no sense" that the Pangs would have remained in their own village well into the second-trimester of an unauthorized pregnancy. IJ Decision at 12. "Why would this couple not protect this pregnancy, when they claim that they, in fact, wanted this child to be born. The respondent and his wife apparently did nothing to protect this pregnancy until well into the pregnancy." *Id.* The majority dismisses this conclusion as "impermissible conjecture." *Ante* at 109. It concludes that "[t]he IJ's assumption that most people in Pang's position would have fled at an earlier point is not self-evident and is not supported by the record." *Id.* The majority specifically faults the IJ for failing to advise Pang that an explanation for his delayed departure was expected. *See id.* at 109–10.

In fact, Pang was afforded an opportunity on cross-examination to explain the timing of his departure from his village. *See Ming Shi Xue v. BIA,* 439 F.3d 111, 125 n. 19 (2d Cir.2006) (recognizing that cross-examination may afford adequate opportunity for explanation). He explained that, in its second trimester, his wife's pregnancy was only showing "slightly" and he was "still looking for [the] right location to put her in safe place in hiding." Hearing Tr. 64. Even on review of a cold record,

Pang's account of a leisurely five-month search for the "right location" in which to hide his wife sounds curious, particularly in light of the serious consequences that would attend discovery of her pregnancy as evidenced by Pang's own dramatic account of his wife's narrow escape from forced abortion followed by the couple's overnight flight. Presumably because Pang, who was represented by counsel throughout his asylum hearing, offered no redirect testimony that his client had taken any other actions during the five months at issue to minimize discovery, which might further have explained the delayed departure, the IJ reasonably concluded that there was no other such evidence. Certainly Pang does not suggest otherwise either in his appeal papers to the BIA or his petition to this court. In these circumstances, I cannot conclude that the IJ was compelled to credit Pang's account of the circumstances of his family's flight from their village.

If the IJ had found Pang not credible based solely on delayed departure or inadequate concealment, I might, nevertheless, agree with the majority that further record development was warranted before conclusively denying relief from removal, particularly since the matter of village flight is somewhat collateral to Pang's claim of persecution. *See generally Ming Shi Xue v. BIA*, 439 F.3d at 123 (holding that, where adverse credibility determination is based on "latent or otherwise not obvious or 'dramatic'" discrepancies, IJ must identify inconsistencies and afford alien opportunity to explain). But where, as in this case, an applicant's credibility is already impugned by dramatic discrepancies in his account of the claimed sterilization, I do not think an IJ errs by noting other implausibilities in the applicant's testimony without exhaustively probing possible explanations for each one. The IJ must ensure that the record as a whole is

adequately developed to permit her to offer specific and cogent reasons for her credibility determination. *See Zhou Yun Zhang v. United States INS*, 386 F.3d at 78. Where, as in this case, an IJ has both identified such reasons based on dramatic inconsistencies and the applicant has been given an opportunity to address collateral implausibilities in his testimony, we have not held that such implausibilities can be given no weight in corroborating an adverse credibility ruling unless all possible explanations are fully explored. *Cf. Xiao Ji Chen v. United States Dep't of Justice*, 434 F.3d at 159 n. 13 ("Although we have stated that an IJ is required to take into account significant factual assertions offered by a petitioner, we have never required, and we do not require here, that an IJ expressly parse or refute on the record each and every one of a petitioner's purported explanations for testimonial inconsistencies or evidentiary gaps." (internal quotation marks and citations omitted)).

Even if the IJ could have developed the record more on this point, I cannot agree with the majority that the IJ's finding, as it stands, was based on "impermissible conjecture." *Ante* at 109. While an IJ's duty to develop the record may sometimes overlap with his duty to avoid "speculation, conjecture, and flawed reasoning," *id.* at 107 (citing Pang's argument), these concerns should not be treated as interchangeable. Implicit in the idea of "flawed" reasoning is the IJ's resort to an analytic process that the law does not recognize. To illustrate, a reasoning process that refuses to believe evidence offered on Tuesdays or through witnesses whose names end in vowels would obviously be flawed. Similarly, a failure to comply with certain procedural rules could, in some instances, result in legally flawed reasoning. Speculation or conjecture, to the extent it reaches conclusions not reasonably

drawn from the evidence, even when viewed through the prism of common sense and human experience, might also be characterized as a form of flawed reasoning. But as this court recently noted in reviewing an asylum petition, "[t]he point at which a finding that testimony is implausible ceases to be sustainable as reasonable, and instead, is justifiably labeled 'speculation,' in the absence of an IJ's adequate explanation, cannot be located with precision." *Ming Xia Chen v. BIA*, 435 F.3d 141, 145 (2d Cir.2006). Drawing a useful analogy from our "clearly erroneous" review of bench trial findings, *Ming Xia Chen* observed that we uphold such findings "unless we are 'left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (internal quotation marks omitted)).

Applying that principle to this case, whether or not members of this panel would have reached the same conclusion as the IJ if we had actually heard Pang's testimony, I cannot say that I am left with a "definite and firm conviction" that the IJ clearly erred in concluding that it made "no sense" for Pang and his wife to remain in their village well into her unauthorized second pregnancy without taking any apparent protective precautions. The circumstances of the couple's eventual departure—their surprising ability to persuade officials to delay a compelled abortion, their successful flight in that twenty-four hour period with a young child in tow, documentary inconsistencies as to whether the Pangs fled alone or together—plainly raise questions about the veracity of Pang's overall account of this incident. Accordingly, I cannot conclude that it was impermissible conjecture for the IJ to factor the Pangs' five-month failure to take any action to conceal the wife's unauthorized pregnancy in assessing his credibility.

c. *The Uneventful Birth of Pang's Son*

The IJ found implausible Pang's testimony that his wife was able to deliver her son at Fuzhou Hospital with "no problem at all" from family planning officials. Hearing Tr. 55. The majority concludes that this finding was also "speculative" and unsupported by the record. *Ante* at 110. I disagree.

The IJ's experience with Chinese asylum applications, like this court's own, permits recognition that China is a highly regulated and controlled society, particularly in limiting the growth of its huge population. Even if we were to assume that a Chinese government hospital would, without question, have delivered a woman who presented herself in advanced labor, it is hardly likely that, after delivery, the woman could have avoided answering questions about her identity, her marital and family status, and her residence, thereby attracting the attention of family planning officials. *See generally Ming Xia Chen v. BIA*, 435 F.3d at 146 (upholding IJ finding of implausibility, without further explanation, regarding applicant's claims that (1) Chinese authorities could locate her in city of over one million people simply by looking in neighborhood where young people lived, or (2) she could escape because her jailors were not paying attention). Indeed, if we were to assume that, in China, a pregnant woman only had to get herself to a hospital in another village or town to give birth to an unauthorized child without attracting the attention of family planning officials, we would have far less reason to be concerned about birth control persecution.

Although, on remand, the IJ may be able to develop the record further on this

point, as well as on her other findings, such development may be unnecessary if she rejects Pang's rebuttal argument with respect to his awareness of the content of his 1993 application. As discussed *supra* at 113–14, that application, which reports that Pang's wife was forcibly sterilized while hospitalized in connection with her son's birth, directly contradicts Pang's hearing testimony, thereby providing substantial evidence to support the IJ's ruling.

### e. *Ancillary Inconsistencies*

To the extent the IJ noted three omissions in Pang's asylum applications as a basis for questioning his credibility, the majority observes that the omissions concerned matters that were ancillary to Pang's claim of persecution. *Ante* at 111–12. Although that conclusion might be debatable, there is no point in pursuing this issue. While evidentiary discrepancies that are not substantially material to the claimed persecution "cannot form the sole basis for an adverse credibility finding," *Secaida–Rosales v. INS*, 331 F.3d 297, 308 (2d Cir.2003) (internal quotation marks omitted), where, as in this case, material discrepancies or implausibilities support an adverse credibility determination, the law does not preclude an IJ from noting that the determination is reinforced by ancillary discrepancies or implausibilities, *see, e.g., Jin Hui Gao v. United States Attorney Gen.*, 400 F.3d 963, 964 (2d Cir.2005) (*per curiam*) (upholding IJ's adverse credibility determination where, in addition to discrepancies as to dates and surrounding details, petitioner's hearing testimony differed substantially from asylum application and asylum interview, in which he failed to mention his wife's forced abortion).

### 3. *Conclusion*

In sum, I agree with my colleagues in the majority that a remand is necessary in this case to permit the IJ to make specific findings as to whether Pang has satisfactorily rebutted the § 208.3(c)(2) presumption of awareness otherwise applicable to his 1993 asylum application. Absent such rebuttal, I would conclude that the discrepancies between Pang's 1993 asylum application and his hearing testimony concerning the circumstances of his wife's alleged forcible sterilization constitute substantial evidence to support the IJ's adverse credibility determination. Further, unlike the majority, I believe that the IJ's other grounds for questioning Pang's credibility reinforce, rather than undermine, the adverse credibility determination. Accordingly, I join only in the introduction and Parts I and IIA of the court's opinion. I do not join in Part IIB.